IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NATHAN EGGEMEYER, SR.,     )
             )
        Petitioner,     )
             )
     v.              )   Case No.  4:02CV01486 CEJ/AGF
             )
DON ROPER,        )
             )
        Respondent.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pro se petition of Missouri state prisoner

Nathan Eggemeyer, Sr., for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The

action was referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for

recommended disposition. For the reasons set forth below, the Court recommends that

federal habeas relief be denied.

On August 13, 1998, Petitioner was convicted by a jury of second-degree murder,

armed criminal action, tampering in the first degree (for operating a vehicle without the

owner's consent), and tampering with evidence. He was sentenced to consecutive terms

of imprisonment for life, twenty years, seven years, and five years, respectively.

Petitioner's convictions and sentences were affirmed on direct appeal on October 12,

1999. His motion for post-conviction relief, filed on May 17, 2000, was denied following

an evidentiary hearing, and this denial was affirmed on appeal on October 29, 2002.

In his habeas petition, dated September 30, 2002, as amended with leave of Court, Petitioner raises the following constitutional claims:

(1) - (4) Trial counsel rendered ineffective assistance by failing to fully advise Petitioner of counsel's conflict of interest, failing to advise Petitioner of his right to refuse to testify and the inherent dangers of testifying, failing to deal effectively with inculpatory testimony by a state's witness (Roy Wagoner), and intentionally soliciting inculpatory responses from a defense witness (John Kootman);

(5) Trial counsel rendered ineffective assistance by failing to depose a certain police officer (Trooper Bill Conway) prior to trial, failing to properly serve the officer with a subpoena to testify at trial, and failing to request a continuance when the officer did not appear at trial;[1]

(6) - (18) Trial counsel rendered ineffective assistance by failing to conduct independent testing of bullet fragments and other physical evidence, failing to tender an impeachment instruction, failing to object to Petitioner being sentenced as a prior offender, and failing to include certain matters in Petitioner's motion for a new trial; appellate counsel rendered ineffective assistance by failing to raise certain issues on direct appeal and to "federalize" other issues;

(19) The cumulative effect of trial and appellate counsels' errors harmed Petitioner;

(20) The trial court erred in denying Petitioner's motion for a new trial based upon a juror's failure to disclose during voir dire that his uncle had been the victim of a homicide; and

(21) The trial court erred in denying Petitioner's motion for a new trial based upon the prosecutor's failure to disclose the inculpatory statement a witness (Mr. Wagoner) claimed Petitioner made to him regarding luring the victim to the scene of the murder.

Respondent argues that this Court is procedurally barred from considering the merits of Claims 1 through 4 and 6 through 19, and that Petitioner is not entitled to habeas

---

[1]    This same claim is also presented as Claim 22.

relief on his remaining claims because the state courts' adjudication of them did not involve an unreasonable application of federal law or an unreasonable determination of the facts.

## BACKGROUND

### Pre-trial and Trial Proceedings

Several months prior to trial, the State moved to disqualify Petitioner's counsel, N. Scott Rosenblum, on the ground that a conflict of interest existed because Mr. Rosenblum might be put in the situation of having to testify in the case. A hearing on the motion was held on May 5, 1998, at which Petitioner and Daniel Diemer, an associate of Mr. Rosenblum's, were present. The State asserted at the hearing that it expected one of its key witnesses, Billy Hawkins, to testify at trial that after the murder, Petitioner told him to steal funds from the adult entertainment club where Hawkins worked, which had been owned by Petitioner and the victim. According to the State, this testimony would establish a motive for the murder, namely, that Petitioner murdered his partner so that Petitioner could loot the business. The State posited that the defense might attempt to impeach Mr. Hawkins as having recently fabricated this testimony, at which point the State would try to rehabilitate Mr. Hawkins by having him testify that in the summer of 1997 he told Mr. Rosenblum that he had stolen funds from the club at Petitioner's request (and had used part of the money to pay part of Mr. Rosenblum's retainer fee in this case). The State continued that Mr. Rosenblum would then be faced with an actual conflict of interest. Mr. Diemer informed the court that the conflict issue had been explained to

Petitioner, and that Petitioner wished to proceed with Mr. Rosenblum as his attorney.
Resp. Ex. C.

On May 12, 1998, the trial court issued a written order disqualifying Mr.
Rosenblum and his firm. The order stated that the court might reconsider the ruling
should Petitioner and Mr. Rosenblum stipulate that Mr. Rosenblum would not testify at
trial, and that Petitioner waived any claim of conflict of interest. Attach. to Petr.'s Mot.
for Leave to Amend (Doc. #16). On May 29, 1998, Mr. Rosenblum filed a written
stipulation that he would not testify with regard to statements made or not made to him by
Mr. Hawkins. Resp. Ex. L-2 at 190. On June 2, 1998, though Petitioner had not
submitted a waiver of conflict, the trial court set aside the disqualification based upon the
stipulation filed by counsel, and Petitioner was represented at trial (and on direct appeal)
by Mr. Rosenblum and Mr. Diemer. On the first day of trial, August 11, 1998, the court
ruled that the State could introduce evidence to support its theory that Petitioner murdered
his partner so that Petitioner could loot the business, but not that stolen money was
allegedly used to retain Mr. Rosenblum specifically. Resp. Ex. A-1 at 11-13

During voir dire, defense counsel asked one side of the venirepanel if anyone or a
"close personal friend" had been the victim of a crime, and asked the other side of the
panel if anyone had perceived that he or she or a "very close relative" was the victim of a
crime. Resp. Ex. A at 86. Venireperson Edwin Stretch did not respond to either of these
questions, and he was eventually seated as a juror.

**Evidence at Trial**

In affirming Petitioner's convictions, the Missouri Court of Appeals summarized the evidence adduced at trial as follows. A review of the record confirms that this summary is fair and accurate. Petitioner does not challenge its accuracy, nor the sufficiency of the evidence to support his convictions.

> Evidence presented at trial demonstrated that [Petitioner] and the victim, Steve Masters, were co-owners of an "adult entertainment club." [Petitioner] had reason to believe that the victim had been stealing money from the club.

> The victim relayed to an employee that he feared [Petitioner] would kill him. He gave a sealed envelope to his girlfriend and told her to give the envelope to police if something happened to him. The envelope contained a letter in which the victim expressed his intent to meet with [Petitioner].

> On the evening of September 10, 1996, the victim met with [Petitioner] at [Petitioner]'s trucking business. Within minutes, [Petitioner] shot the victim once in the back of the head. [Petitioner] received help from his son and his employee, Robert Wagoner, in disposing of the body, and took steps to conceal the crime.

> Wagoner later [about nine months after the murder] went to the Ste. Genevieve County Sheriff's Department to report that [Petitioner] had killed the victim. [Petitioner]'s son took the officers to the body.

> Petitioner was arrested and charged with the victim's murder [in the first degree], armed criminal action, tampering in the first degree and tampering with physical evidence. At trial, he testified and claimed that he had shot the victim in self defense. [Petitioner] also presented seven other witnesses in support of his defense.

Resp. Ex. H at 2-3.

To the above the Court adds that Mr. Hawkins testified for the State that shortly after the day of the murder, Petitioner asked him to "juggle the books" at the club and to set aside about $2,000 to $3,000 in cash per week and place this money in a drawer in

Petitioner's desk.  Mr. Hawkins testified that he did so, skimming a total of about

$100,000.  Resp. Ex. A-1 at 194- 95.  On cross-examination, Mr. Rosenblum elicited

from Mr. Hawkins that Petitioner used some of this money to pay personal debts, but that

he used a large portion of the money to pay laborers who were working on an addition to

the club.  Id. at 202-04.  Defense counsel did not suggest to Hawkins that he had recently

fabricated his testimony that Petitioner told him to steal the money.

The Court further notes, with regard to Mr. Wagoner's testimony, that Mr.

Wagoner, who worked as a dispatcher for a trucking company owned by Petitioner,

testified for the State that on the evening of the murder, Petitioner called him on the

phone, told him that he had killed the victim, and asked him to bring him a truck.  Mr.

Wagoner further testified that when he arrived at Petitioner's place of business with the

truck, he saw the victim's body on the ground, and Petitioner told him to help him and

Petitioner's son load the body on the truck.  Petitioner and his son drove off with the

body, and when they returned about 30 minutes later, Petitioner told Mr. Wagoner that he

had put the body behind an old barn.  Id. at 226-27.

During cross-examination, defense counsel asked Mr. Wagoner whether or not he

knew what had happened prior to his arrival on the scene.  Mr. Wagoner admitted that he

did not.  To emphasize the point, counsel asked Mr. Wagoner, "Since that night you never

learned from [Petitioner] or anybody else what happened on that parking lot prior to the

time that you got there?"  Id. at 255.  The following response and questioning ensued:

> Mr. Wagoner:  Prior to the time I got there he said he called him and told
> him to bring lots of money he was leaving the country and he was in
> trouble.

> Defense counsel: What did you just say?
>
> Mr. Wagoner: That that's how he got Steve [the victim] down there.
>
> Defense counsel: That's how he got Steve down there. Have you ever said that before, Roy?
>
> Mr. Wagoner: No.
>
> Defense counsel. The first time you are making that statement is right now isn't it?
>
> Mr. Wagoner: Actually I made it yesterday.
>
> Defense counsel: Then the first time that you made that statement in this case was yesterday?
>
> Mr. Wagoner: Correct.

Id. at 255-56. Counsel continued to cross-examine Mr. Wagoner, repeatedly bringing out that Mr. Wagoner had never before mentioned to anyone, including the police or during his deposition, that Petitioner had made this statement to him. Id. at 256-64, 284-86. At the close of Mr. Wagoner's testimony, defense counsel moved for a mistrial based upon the prosecutor's failure to comply with discovery in not disclosing the above statement as soon as the prosecutor learned about it. The prosecutor stated as follows: "Judge, I agree that I'm under a duty to provide it to them. I didn't find out about the statement. I didn't use it. I am not required to disclose evidence that appears and emerges through cross-examination." Resp. Ex. A-2 at 296. The court overruled the motion for a mistrial, and the trial continued. Id.

During cross-examination of Petitioner's son, defense counsel questioned him regarding his interrogation by the police prior to his statement to them describing his

involvement in transporting the victim's body at Petitioner's direction. Petitioner's son testified that the interrogation lasted several hours; that he was scared and crying; that he was told that he could be charged with first-degree murder, which carried the death penalty; and that when he asked to speak with someone who could explain things to him, the prosecutor was presented to him as a lawyer. Tr. at 326-31.

Before presenting Petitioner's defense case, defense counsel asked for a mistrial based upon the failure of one of the main investigating officers, Trooper Conway, to honor a subpoena served on July 30, 1998, to appear to testify at trial. Counsel stated that on August 3, 1998, he received a message that Trooper Conway was under military orders to leave on August 8 for Korea. Defense counsel stated that he left a voice message for Trooper Conway telling him he had to remain and honor the subpoena. Id. at 405-09.

The court, noting that the proof of service of the subpoena did not seem valid, asked defense counsel what helpful evidence he thought he could elicit from Trooper Conway that had not already been developed from the police reports and other witnesses. Defense counsel stated that, among other things, Trooper Conway was instrumental in the interrogation of Petitioner's son, and that counsel wanted to develop with Trooper Conway matters regarding the circumstances of the interrogation. The trial court denied the motion for a mistrial. Id. at 409-10. During closing argument, defense counsel argued that the interrogation of Petitioner's 18-year-old son was threatening and coercive, "making him say exactly what they wanted him to say to get his dad." Tr. at 589-91.

**Motion for a New Trial**

One of the grounds raised by Petitioner in his motion for a new trial was that it had come to the attention of defense counsel that juror Stretch had not been forthcoming during voir dire about his father's homicide. The court held an evidentiary hearing on this issue on October 6, 1998, at which it was clarified that Mr. Stretch's uncle, not his father, had been the victim of a homicide. Mr. Stretch testified that he did not recall being asked during voir dire whether or not he or a family member had been the victim of a crime in the past. He stated that he was told by his family that his uncle had been murdered, but that he had no memory of the event as he was only two or three years old when it happened. He also testified that he did not know any details about the homicide, that it never came up in family conversations, and that he did not intentionally lie during voir dire to get on the jury. Resp. Ex. B at 3-5. The trial court did not make specific findings following the hearing, but denied the motion for a new trial on this and all other grounds raised therein. Id. at 6-7.

**Direct Appeal**

Petitioner presented two arguments on direct appeal, namely, that the trial court abused its discretion in overruling Petitioner's motion for a new trial based on his claims that (1) Mr. Stretch failed to disclose that his uncle had been the victim of a homicide; and (2) the prosecutor did not disclose, in violation of state law, the inculpatory statement Mr. Wagoner claimed Petitioner made to him regarding the manner in which he allegedly lured the victim to the scene of the murder, which undercut Petitioner's defense of self defense. Resp. Ex. E.

The Missouri Court of Appeals rejected both arguments. The court held that Petitioner's first claim failed because the record indicated that Mr. Stretch did not intentionally conceal information. The court pointed to Mr. Stretch's testimony that he did not recall being asked whether he or any family member had been the victim of a crime, and that the crime occurred when he was a toddler and he knew no details about it. The appellate court noted the deference to be accorded to the trial court's credibility determination in believing Mr. Stretch. Resp. Ex. H at 2-4.

The appellate court also deferred to the trial court on Petitioner's second claim, stating that it was within the trial court's discretion to believe the prosecutor when he told the court that he had no knowledge of the statement prior to Mr. Wagoner's testimony. The appellate court further held that even assuming the State violated state law by not disclosing the statement in question, this would not have warranted the drastic remedy of a mistrial, which was the only remedy sought by the defense. The court also concluded that Petitioner did not demonstrate that the outcome of the trial would have been different if defense counsel had been able to prepare to meet the evidence. The court pointed to the other evidence that Petitioner did not kill the victim in self defense – that the victim feared for his life prior to meeting with Petitioner, that Petitioner shot the victim in the back of the head, and that Petitioner went to great lengths to cover up his offense. Id. at 4-7.

**State Post-conviction Proceedings**

Petitioner sought post-conviction relief under Missouri Supreme Court Rule 29.15. In his amended motion, prepared with the assistance of counsel, Petitioner raised numerous grounds for relief, including those he presents in his habeas petition as Claims 1

through 19.  Resp. Ex. at 115-89.  Petitioner, however, raised only one point on appeal from the denial of his post-conviction motion, namely, that trial counsel rendered ineffective assistance by failing to depose Trooper Conway prior to trial, failing to properly serve the officer with a subpoena to testify at trial, and/or failing to request a continuance when the officer did not appear at trial.  Resp. Ex. M.  This issue is presented as Claim 5 and repeated as Claim 22 in the present habeas petition.  The state trial court held an evidentiary hearing on Petitioner's post-conviction motion on May 1, 2001, at which, on this issue, Petitioner and Mr. Rosenblum testified in person and Officer Conway testified by deposition.

Petitioner testified that he understood that Trooper Conway was going to be at the trial.  Resp. Ex. I at 11-12.  Mr. Rosenblum was asked why he did not take Trooper Conway's deposition during the eight days between the trial and when he learned that Trooper Conway would be going to Korea.  Mr. Rosenblum responded that there were other officers who could testify about everything Conway could, and that although it was his strategy as a matter of course to subpoena every officer involved in a case, it was his practice not to call too many witnesses to testify.  When asked about his argument to the trial court when requesting a mistrial due to Trooper Conway's absence, Mr. Rosenblum testified that he was arguing "potential importance."  He testified that Trooper Conway's deposition would not have been helpful at trial, as counsel was able to use the police reports effectively to impeach State witnesses where needed, and as there were other officers who were involved in the interviews in the case whom he could have called to testify if necessary.  Id. at 38-40.

Trooper Conway testified that he and another officer were the lead investigators in this case, and that he interviewed Petitioner's son. Other than confirming that he had interviewed Petitioner's son, the questions to Trooper Conway pertained to his interviews of Mr. Wagoner. Trooper Conway testified that he was involved in two interviews of Mr. Wagoner, with three other officers present during the first interview and two other officers present during the second interview. He further testified that he was the officer assigned to write the reports of these interviews. Resp. Ex. J.

In rejecting this claim, the motion court pointed to Trooper Conway's testimony that there were other officers present during the interviews. The court noted that these officers were available to defense counsel to call as impeachment witnesses if that were determined to be necessary. The court accepted Mr. Rosenblum's stated strategy of calling as few witnesses as possible as reasonable trial strategy, in light of Mr. Rosenblum's testimony that he believed he had adequately impeached, by means of the police reports, any witnesses that Trooper Conway could have impeached. The court added that Petitioner was "not entitled to relief in a postconviction proceeding on grounds of ineffective assistance of counsel for counsel's failure to present evidence which would have impeached the State's witnesses because the facts, even if true do not establish a defense." Resp. Ex. L-2 at 261-62.

On appeal from the denial of this claim, Petitioner argued that defense counsel did not make a strategic decision not to call Trooper Conway, but rather failed to serve him properly, and then failed to depose him after learning that he would be out of the country at the time of trial. Petitioner argued that counsel's testimony at the post-conviction

hearing was not credible, and that his remarks to the court during trial should be considered the more accurate reflection of counsel's belief of the importance of Trooper Conway's testimony. Petitioner argued that he was prejudiced by counsel's deficient performance because Trooper Conway could have testified about Petitioner's son's interrogation, bolstering the defense theory that the son's statement to the police was coerced. Resp. Ex. M at 15-18.

The Missouri Court of Appeals affirmed the motion court's decision. The appellate court concluded that Trooper Conway's deposition testimony that other officers were present during his interrogations supported defense counsel's assessment that Trooper Conway's testimony was unnecessary. The court further held that any testimony by Trooper Conway would have been cumulative, and that Petitioner did not prove that he was prejudiced by Trooper Conway not testifying at trial, because while the proposed testimony of Trooper Conway may have had some impeaching effect, it failed to prove the falsity of the son's testimony. The court stated that on cross-examination, defense counsel was able to present evidence of the intensity of the interrogation of Petitioner's son. In sum, the appellate court held that the conclusions of the motion court were not clearly erroneous. Resp. Ex. O.

## DISCUSSION

### Procedurally Defaulted Claims

Respondent first argues that this Court is procedurally barred from considering Petitioner's Claims 1 through 4 and 6 through 19, due to Petitioner's failure to present these claims to the state appellate court on appeal from the denial of post-conviction relief.

Under the doctrine of procedural bar, a federal habeas court will not review a claim that a habeas petitioner procedurally defaulted in state court by not meeting the state's procedural requirements for presenting the claim. Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (citing Coleman v. Thompson, 501 U.S. 722, 732 (1991)). Here, as Respondent argues, Petitioner did not present the claims in question to the Missouri Court of Appeals. These claims were thus defaulted in state court. See Sweet v. Delo, 125 F.3d 1144, 1149 (8th Cir. 1997) (a Missouri criminal defendant procedurally defaults claims not raised on appeal from the denial of post-conviction relief); Reese v. Delo, 94 F.3d 1177, 1181 (8th Cir. 1996) (same); Lowe-Bey v. Groose, 28 F.3d 816, 818-20 (8th Cir. 1994) (same).

A habeas petitioner can overcome a procedural default if he demonstrates both cause for the default and actual prejudice therefrom, or that the failure to review the federal claim "will result in a fundamental miscarriage of justice." Edwards, 529 U.S. at 451. The miscarriage-of-justice exception permits review of a defaulted claim "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 496 (1986). Here, Petitioner states in his petition that Claims 1 through 19, with the exception of Claim 5, were not raised on appeal from the denial of his post-conviction motion "'Against Petitioner's Request,'" and he seeks review of these claims under "'Fundamental Fairness.'" In his traverse, Petitioner states that counsel appointed to appeal the denial of post-conviction relief clearly erred in not raising all of the claims presented in the motion.

In the amendment to his petition (Doc. #16), Petitioner asserts that he is procedurally actually innocent with respect to the claim that trial counsel was under a

conflict of interest.  Petitioner bases this assertion on the allegation that the trial court did not involve Petitioner in the decision to set aside the disqualification.  Petitioner contends that counsel labored under an actual conflict, and that conflict-free counsel would have pursued other defense strategies, including effectively cross-examining Mr. Hawkins with respect to his testimony that Petitioner told him shortly after the murder to steal funds from the club.

"The requirements to establish the requisite probability of innocence [to excuse a procedural default] are high.  [A habeas petitioner] must first come forward with new evidence that was not available at trial, and then he must show that 'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" Osborne v. Purkett, 411 F.3d 911, 920 (8th Cir. 2005) (quoting Schlup v. Delo, 513 U.S. 298, 327 1995)); Amrine v. Bowersox, 238 F.3d 1023, 1029 (8th Cir. 2001)).  Petitioner has not presented any new evidence of his innocence.  Furthermore, because there is no federal constitutional right to the effective assistance of post-conviction counsel, the ineffective assistance of appellate post-conviction counsel cannot constitute cause to excuse a procedural default.  Clay v. Bowersox, 367 F.3d 993, 1005 (8th Cir. 2004), cert. denied, 125 S. Ct. 2246 (2005).

The Court concludes that Petitioner has not established any ground upon which to excuse his procedural default with respect to Claims 1 through 4 and 6 through 19. Accordingly, this Court is barred from considering the merits of these claims.  The Court will proceed to consider the merits of Claim 5 (also raised as Claim 22) (counsel's

ineffectiveness regarding Trooper Conway), Claim 20 (Juror Stretch's failure to disclose

his uncle's homicide), and Claim 21.

**Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when

a claim has been adjudicated on the merits in state court, an application for a writ of

habeas corpus cannot be granted unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A decision by a state court is "contrary to" clearly established law of the Supreme

Court "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court]

cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision

of [the Supreme Court] and nevertheless arrives at a result different from our precedent.'"

Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405

(2000)). A state court "unreasonably applies" clearly established federal law when it

"identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S.

at 413; Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003).

A case cannot be overturned merely because it incorrectly applies federal law, for

the application must also be "unreasonable." Williams, 529 U.S. at 411; Colvin v. Taylor,

324 F.3d 583, 587 (8th Cir. 2003) (under AEDPA, a writ of habeas corpus may not be

granted "unless the relevant state court decision is <u>both</u> wrong <u>and</u> unreasonable").

> The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to an even more deferential review. Relief may be granted if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Factual findings by the state court "shall be presumed to be correct," a presumption that will be rebutted only by "clear and convincing evidence." <u>Id.</u> § 2254(e)(1).

<u>Kinder v. Bowersox</u>, 272 F.3d 532, 538 (8th Cir. 2001).

## **<u>Ineffective Assistance of Counsel with Respect to Trooper Conway (Claims 5 and 22)</u>**

Petitioner claims that trial counsel was constitutionally ineffective in failing to

depose Trooper Conway prior to trial, properly serve Trooper Conway with a subpoena to

testify at trial, and/or request a continuance when the officer did not appear at trial. The

Sixth Amendment guarantees a criminal defendant the right to effective assistance of trial

counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). To succeed on a claim of

ineffective assistance, a habeas petitioner must establish both "that counsel's representation

fell below an objective standard of reasonableness," and that but for counsel's deficiency

there is "a reasonable probability" that the result of the trial would have been different." <u>Id.</u>

at 688.

There is a strong presumption that counsel's performance fell "within the wide range

of professional assistance." <u>Odem v. Hopkins</u>, 382 F.3d 846, 850 (8th Cir. 2004) (quoting

<u>Strickland</u>, 466 U.S. at 689). "Lawyers are not perfect, and the Constitution does not

guarantee a perfect trial." <u>Jones v. Delo</u>, 258 F.3d 893, 902 (8th Cir. 2001). "Reasonable

trial strategy does not constitute ineffective assistance of counsel simply because it is not

successful." James v. Iowa, 100 F.3d 586, 590 (8th Cir.1996). However, "counsel must exercise reasonable diligence to produce exculpatory evidence, and strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir. 1991).

Error by counsel, even if professionally unreasonable, does not necessarily require that a judgment be set aside. A petitioner must also affirmatively show prejudice. It is not sufficient for a petitioner to show that the error had some "conceivable effect" on the result of the proceeding. Strickland, 466 U.S. at 693. While a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case," he must show that because of counsel's error, "there is a reasonable probability that the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 693-94.

Moreover, in the context of a § 2254 petition, a petitioner "'must do more than show that he would have satisfied Strickland's test if his claims were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied Strickland incorrectly. Rather he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner.'" Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004) (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)).

Here, Petitioner has not shown that counsel's performance was deficient, but even assuming that defense counsel's performance in failing to depose Trooper Conway prior to trial was deficient, Petitioner has not established resulting prejudice. Even had Trooper

Conway testified at trial -- by deposition or in person -- in accordance with his testimony at the post-conviction hearing, there is no reasonable probability that the outcome of the trial would have been different. Trooper Conway was not privy to any facts that other police officers who were available to testify did not know. And defense counsel was able to effectively cross-exam Petitioner's son with respect to the content and circumstances of his interrogation by the police and the veracity of his statement to them, and his testimony at trial. Moreover, there is nothing in this record to suggest that Trooper Conway would have testified in a manner that would have suggested any overbearing tactics during the interrogation of Petitioner's son. Trooper Conway offered no such testimony at his deposition. Resp. Ex. J. Thus, this Court cannot say that the state appellate court's rejection of this claim was factually or legally unreasonable.

**Juror's Failure to Disclose Information (Claim 20)**

Petitioner claims that his constitutional rights were violated by the trial court's denial of his motion for a new trial based upon Juror Stretch's failure to disclose during voir dire that his uncle had been the victim of a homicide. A defendant's right to be tried by a fair and impartial jury is guaranteed by the Sixth Amendment (applicable to Missouri through the Fourteenth Amendment). Irvin v. Dowd, 366 U.S. 717, 722 (1961). In Fuller v. Bowersox, 202 F.3d 1053 (8th Cir. 2000), the Eighth Circuit explained that to be entitled to habeas relief on the basis of a juror's failure to disclose information, a petitioner bears the burden

> not only to show that a juror failed to disclose a material fact during voir dire, but also to establish that the juror was in fact biased. In other words, a juror's apparent dishonesty is not a sufficient predicate to obtaining a new trial.

> Instead, because the central concern in habeas cases is the fundamental fairness of the proceeding, only those reasons for failing to disclose information that affect a juror's impartiality can truly be said to affect the fundamental fairness of a trial. For habeas corpus purposes, such bias may be found either by an express admission, or by proof of specific facts which show such a close connection to the facts at trial that bias is presumed.

Id. at 1056 (internal citations and quotation marks omitted) (juror's failure to reveal that he had worked for a law enforcement agency and that his mother worked as a jailer at the jail in which defendant in a murder case was held during trial did not violate petitioner's rights to an impartial jury and due process, given absence of evidence of bias on the juror's part); see also Cannon v. Lockhart, 850 F.2d 437, 440-41 (8th Cir. 1988) (juror's inadvertent failure to disclose on voir dire in a murder case that decedent had gone to same school as juror's child did not entitle defendant to new trial absent showing that juror was biased against defendant).

Here, as noted above, the state trial court made no specific findings before denying Petitioner's motion for a new trial based upon Mr. Stretch's presence on the jury. Petitioner, however, has not offered any evidence of actual bias on the part of Mr. Stretch. Nor does the Court believe that bias may be implied from the fact that Mr. Stretch's uncle was the victim of a homicide when Mr. Stretch was a toddler. Courts have presumed juror bias in "extreme" situations where the juror was connected to the litigation at issue in some way that makes it "highly unlikely that he or she could act impartially during deliberations." Hunley v. Godinez, 975 F.2d 316, 319 (7th Cir. 1992) (bias presumed where four jurors were burglarized while sequestered during petitioner's trial for murder and burglary); see also, e.g., Burton v. Johnson, 948 F.2d 1150, 1157 (10th Cir. 1991) (juror in a murder trial where defense was battered wife syndrome was presumed biased because juror herself was

involved in an abusive family situation at the time of the trail). No such situation exists here. In fact, on this record, it does not appear that Juror Stretch's response (or failure to respond) was either misleading or incomplete. As noted, the jurors were asked whether a "close personal friend" or a "very close relative" was the victim of a crime. Resp. Ex. A at 86. There is nothing in the record to suggest that Juror Stretch would deem his uncle, whom he did not remember at all, to fall into either category. Resp. Ex. B at 5. In sum, the Court does not believe that the state courts' adjudication of this issue involved an unreasonable application of federal law or an unreasonable determination of the facts in light of the trial proceedings and the hearing on the motion for a new trial.

**State's Failure to Disclose an Inculpatory Statement (Claim 21)**

Petitioner argues that his constitutional rights were violated by the trial court's denial of his motion for a new trial based upon the prosecutor's failure to disclose the statement Mr. Wagoner testified Petitioner made to him regarding luring the victim to the scene of the murder. As noted above, Mr. Wagoner testified at trial that Petitioner told him that he (Petitioner) had called the victim before the murder and told him to bring money to Petitioner because Petitioner was leaving the country and was in trouble. It is undisputed that the prosecutor had not previously disclosed to the defense this inculpatory statement by Petitioner. When the defense sought a mistrial based upon this surprise testimony, the prosecutor stated that he did not know about the statement which emerged during cross-examination. The Missouri Court of Appeals deferred to the trial court's apparent acceptance of the prosecutor's assertion over the assertion of Mr. Wagoner that he told the prosecutor the previous day about Petitioner's alleged statement.

This Court is certainly in no position to second-guess the trial court's apparent credibility determination. Furthermore, assuming the trial court's rejection of Petitioner's motion for a new trial was based on some ground other than believing that Mr. Wagoner never told the prosecution about the statement in question, this Court concludes that there was no violation of Petitioner's constitutional right to a fair trial. Although due process requires prosecutors to disclose exculpatory evidence, Brady v. Maryland, 373 U.S. 83 (1963), there is no such requirement with regard to inculpatory evidence. Gray v. Netherland, 518 U.S. 152, 168-69 (1996) (citing Weatherford v. Bursey, 429 U.S. 545, 559 (1977) (rejecting due process claim of a defendant who had been convicted with the aid of surprise testimony of an accomplice who was an undercover agent; "There is no general constitutional right to discovery in a criminal case, and Brady did not create one.")). Absent some constitutional violation, a violation of state law does not provide a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). In addition, the Court notes that defense counsel was able to effectively cross-examine Mr. Wagoner regarding the truth of his testimony on this matter. Counsel affirmatively elected to cross-examine Mr. Wagoner regarding the alleged statement before making any objection, and counsel used Mr. Wagoner's failure to disclose the statement previously to discredit his testimony overall. Thus Petitioner was not prejudiced by the surprise testimony to the extent that his right to a fair trial was violated.

## CONCLUSION

The Court concludes that petitioner is not entitled to federal habeas relief on any of the claims presented in his habeas petition. Furthermore, the Court does not believe that

reasonable jurists might find the Court's assessment of Petitioner's claims for habeas relief debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. §2253(c)(1)(A).  See Miller-El v. Cockrell, 537 U.S. 322, 336-37 (2003) (standard for issuing Certificate of Appealability) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the petition of Nathan Eggemeyer, Sr., for habeas corpus relief be is **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability be denied on all claims.

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that the failure to file timely objections may result in a waiver of the right to appeal questions of fact.

Audrey G. Fleissig
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of January, 2006.